UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-23645-CIV-HOEVELER

CARLES CONSTRUCTION, INC., a Florida
corporation, REINALDO CARLES, and
MARIA C. CARLES,

      Plaintiffs,

v.

TRAVELERS CASUALTY & SURETY
COMPANY OF AMERICA, a foreign corporation,

      Defendant.

_____/

TRAVELERS CASUALTY & SURETY
COMPANY OF AMERICA, a foreign corporation,

      Counter-Plaintiff and Third-Party Plaintiff,

v.

CARLES CONSTRUCTION, INC., a Florida
corporation, REINALDO CARLES, MARIA C. CARLES,
CARLES MANAGEMENT, INC.,

      Counter-Defendants and Third-Party Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION TO STRIKE, DENYING MOTION FOR SUMMARY JUDGMENT AS TO COUNTER-CLAIMS AND THIRD-PARTY CLAIM, AND RULING ON DEFENDANT'S MOTIONS *IN LIMINE*

This Cause comes before the Court on the Defendant's motions seeking

summary judgment as to Plaintiff's claims and Defendant's counterclaims

and third-party claims, and also seeking to strike the Affidavit of Plaintiff

Reinaldo Carles, Jr.  Having reviewed the parties' arguments, the evidence,

and governing precedent, the Court finds that Defendant is not entitled to

summary judgment as to any of the claims, counterclaims, or the third-party

claim, as material facts remain in dispute.  In addition, the Court will not

strike the Affidavit of Plaintiff, and has denied the Defendant's motion *in*

*limine* seeking to prohibit introduction of mediation-related evidence at trial.[1]

## INTRODUCTION

Plaintiff Carles Construction ("Carles") was a subcontractor on two

condominium construction projects, Quantum on the Bay and Brickell on the River.

Pursuant to agreements entered into in late 2004 and early 2005, Carles was to

perform concrete formwork for general contractor Facchina-McGaughan, LLC

("Facchina").[2]  In 2007, after Facchina failed to pay Carles for work performed on

the construction projects, Carles filed actions in state court demanding payment

pursuant to payment bonds which had been issued on behalf of Facchina by St. Paul

Fire and Marine Insurance Company ("St. Paul"), reportedly a "wholly owned

---

[1]As to the other motions *in limine* - the Court has granted each motion, as no opposition was filed.

[2]Facchina-McGaughan, LLC, is not a party to this action.

2

subsidiary of the St. Paul Travelers Companies, Inc."[3]  The claims of Carles were for

approximately $4,500,000 in unpaid earnings as to the two construction projects.

Facchina raised counterclaims against Carles seeking a total of $16,000,000,

alleging that Carles had performed unsatisfactory work and was responsible for

construction delays as to one of the projects.

Travelers Casualty & Surety Company of America ("Travelers") had issued

performance bonds guaranteeing to Facchina that Carles would perform the work

required as to each of the two construction contracts.  According to Travelers, it

assumed the defense of Carles as to the counterclaims brought by Facchina in the

state court actions due to a concern that Carles's attorneys were not adequately

defending the claim, even though Travelers had not been sued by Facchina in those

actions.  Travelers also, apparently, assumed the prosecution of Carles's claim

against the St.Paul-issued payment bond (which named Facchina as principal and

guaranteed payments to contractors such as Carles).  All of the disputes between

Carles and Facchina were settled by Travelers after mediation in 2009 for a

payment of $3,550,000 made to Facchina, and nothing paid to Carles; the payment

to Facchina was made by Travelers.

Plaintiffs are unhappy with the settlement and filed the present case against

Travelers in state court in 2009, seeking damages for breach of its surety agreement

---

[3]St. Paul Fire and Marine Insurance Company ("St. Paul") is not a party to
this action.  The Court has quoted the description of St. Paul from the Plaintiffs
state court complaints, Case No. 07-24733-CA-20 (as to the Brickell on the River
project), and Case No. 07-31269-CA-24 (as to the Quantum on the Bay project).

3

(the alleged breach is the settling of the claims made by Facchina without regard to the claims made by Carles against Facchina).  Plaintiffs also allege that Defendant engaged in a conspiracy with Facchina to fraudulently conceal Carles's valid claims. Plaintiffs complain that Travelers operated in this case under a conflict of interest because of its direct corporate relationship to St. Paul (the issuer of the payment bonds guaranteeing that Facchina would pay Carles).  Plaintiffs argue that Travelers elected to diminish Carles's claims against Facchina not only because Travelers itself would have been responsible for those claims,[4] but also because Travelers wanted to preserve an ongoing beneficial commercial relationship with Mr. Facchina, reportedly a customer of Travelers who generated $2,000,000 per year in premiums paid to the company.  Plaintiffs also seek a declaration that they are not obligated to indemnify Defendant because of Defendant's bad faith in settling Carles's claims against Facchina.

Defendant timely removed the case to this Court pursuant to 28 U.S.C. § 1332 and, after this Court dismissed Plaintiff's claims for violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201-501.213, and for statutory bad faith,[5] Defendant answered the complaint.  Defendant also

---

[4]As discussed later in this Order, the record reveals that Travelers (the issuer of the bonds naming Carles as principal) was at least related in some way to St. Paul (the issuer of the bonds naming Facchina as principal) and, indeed, Travelers and St. Paul may have been the same corporate entity at the time of the settlement discussions between Carles and Facchina.

[5]This Court's order of February 11, 2013, dismissed Plaintiffs' allegations of bad faith brought pursuant to Fla. Stat. § 624.155, noting, however, that to the

filed a Counterclaim/Third Party Complaint seeking specific performance of the indemnity agreement which the parties executed as a requirement before Defendant would issue the performance bonds naming Carles as principal.  In addition, Defendant has claims for breach of contract, exoneration and indemnity.

The parties agree on many of the relevant facts in this case, but there is significant disagreement as to the essential issue: what actions were taken by Travelers in conducting the settlement of Carles's claims against Facchina and Facchina's claims against Carles.  Other material facts remain in dispute, including the question of whether or not Travelers and St. Paul were the same entity at the time that the state court actions were being pursued between Carles and Facchina and being settled by Travelers.  As these facts are critical to the determination of whether Defendant breached its surety agreement with Plaintiffs or conspired with Facchina to eliminate Carles's valid claims, summary judgment is not warranted as to any of the claims, counter-claims, nor third-party claims.

<u>FACTS</u>

The surety agreements and bonds at issue are related to the construction of two condominium projects, Quantum on the Bay and Brickell on the River.  The

_____

extent that Plaintiffs brought such allegations as an obligee on the payment bonds which had been issued naming Facchina as principal, the dismissal was without prejudice to refile, as such claims are permissible under Florida law.  When Plaintiffs filed their Second Amended Complaint in May 2013, they elected to abandon the statutory bad faith claim.

owner of those two projects required that payment and performance bonds be obtained.[6]  Facchina was the general contractor for these projects and Plaintiff Carles Construction, Inc. ("Carles"), served as a subcontractor performing concrete work for Facchina.[7]

In October 2004, Plaintiffs executed a General Agreement of Indemnity in favor of Defendant.  General Agreement of Indemnity, ECF No. 84-1 ("Indemn. Agr.").[8]  This Agreement was entered into by Plaintiffs as a requirement before Defendant would issue any bonds naming Carles as principal.   Travelers's [as Counterclaimant/Third Party Plaintiff] Statement of Material Facts, ECF No. 128 ("Travelers's Facts"), ¶ 3; Counter-Defendants' Statement of Material Facts, ECF No. 136 ("Carles's Facts"), ¶ 3.

The Indemnity Agreement provides that the Company, i.e., Travelers, "shall have the right, in its sole discretion, to determine for itself and the Indemnitors whether any claim or suit brought against the Company or the Indemnitors upon

---

[6]Second Amended Complaint ("Sec. Am. Compl."), ¶ 12; Defendant's Answer, ¶ 12.

[7]Specifically, on October 6, 2004, Carles entered into a contract to perform concrete formwork for the Quantum on the Bay project, and on May 5, 2005, Carles entered into a contract to perform concrete formwork for the Brickell on the River project. Sec. Am. Compl., ¶¶ 11, 13, 16; "Tolling and Standstill Agreement" dated April 30, 2008, ECF No. 29-1 ("Tolling Agr.") (providing dates of contracts).

[8]Plaintiffs Reinaldo and Maria Carles, as "Indemnitors," each signed the General Agreement of Indemnity.  ECF No. 84-1.  Reinaldo Carles also signed the Agreement on behalf of Plaintiff Carles Construction, Inc., and also on behalf of Carles Management, Inc. (Carles Management is a Third-Party Defendant in this action.)

*any such Bond* shall be paid, compromised, settled, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors." Indemn. Agr., ¶ 5 (emphasis added).[9]  Default is defined, in part, as any of the following: "(a) declaration of Contract default by the obligee or entity for whom a Contract is performed; (b) actual breach or abandonment of any Contract; (c) a breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill in connection with any Contract ...." Id., ¶ 2.  According to the Agreement, Travelers had the right to "[a]ssert or prosecute any right or claim in the name of the Indemnitors and to settle any such right or claim as the Company sees fit" and had the right to "offset losses on any Contract or Bond against proceeds, funds, or property due from another Contract, Bond or other contract." Id., ¶ 7(c), (f).

Subsequent to the execution of the Indemnity Agreement, bonds were issued by Travelers as to the Quantum project and the Brickell project in the amounts of $12,558,000 (bond number 104384789), and $6,470,000 (bond number 104606427), respectively, each naming Carles as principal.  Travelers' Facts, ¶ 6; Carles' Facts, ¶ 6.  The performance bonds, a sample of which is in the record before the Court

---

[9]"Bonds" are defined as "certain bonds, guarantees, undertakings and/or contractual obligations" for which Travelers has obligations, and "Contract" is defined to mean an agreement of the Indemnitors for which the Company executes a Bond, procures a Bond, assumed the obligations of a Bond, or has guaranteed performance." Id.

(ECF No. 111-3, pp. 2-3),[10] provided that Defendant (as surety) would promptly remedy a default by the principal, Carles. Specifically, the bond states that whenever the "Principal shall be, and declared by Obligee to be, in default under the contract, the *Obligee having performed Obligee's obligations thereunder*, the Surety may promptly remedy the default or shall promptly [complete the contract]." ECF No. 111-3, p.2 (emphasis added).

The payment bond, a partial sample of which is in the Court record (only a single page of the form was provided), guaranteed that the principal (Carles) would promptly pay all persons having claims for labor, materials, etc. See ECF No. 111-3, p. 1. A separate payment bond had been issued by St. Paul naming Facchina as principal, presumably providing similar assurances that Carles (as obligee) would be paid promptly.[11]

---

[10]The parties do not have executed copies of the performance bonds, but it is undisputed that the form included in the record accurately represents the bonds issued. In addition, the Indemnity Agreement specifies that "[t]he failure to sign or the improper execution of a Bond shall not affect the Company's rights under this Agreement." Indemn. Agr., ¶ 17. Thus, whether the bonds were executed properly or not is irrelevant to enforcement of the Indemnity Agreement.

[11]When this case was first filed, Plaintiffs alleged that the Defendant was the surety company for Plaintiffs and also for Facchina. Complaint, ECF No. 1, p. 11, § 15. Plaintiffs' amended complaint modified the allegation to state that Defendant had "otherwise assumed the obligations of the original surety," St. Paul, which had issued the payment bond on behalf of Facchina, Corrected Amended Complaint, ECF No. 66, ¶8, but Plaintiffs still maintained that Defendant was the surety company for both Facchina and Carles, id., ¶ 18, and that both Facchina and Carles were the principals on bonds issued by Defendant as to the same construction projects, id., ¶ 20. Similar allegations are in the operative pleading before the Court, see Second Amended Complaint, ECF No. 108, ¶¶ 18, 20, 24. According to defense counsel in this case, "St. Paul issued separate bonds to Facchina-

8

According to Plaintiffs, Facchina was "always delayed" in making payments to Carles.  Transcript of Deposition Testimony of Reinaldo Carles, ECF No. 111-1 ("Carles Test."), pp. 92-93.  Plaintiff Reinaldo Carles, the President of Carles Construction, claims to have contacted Travelers in late 2006 and "asked [Travelers representative] to come down here to meet with Facchina so they can see firsthand the disaster that they had out in that job [at the Quantum on the Bay project].  The way that [Facchina was] managing that job and what was going on."  Carles Test., pp. 79, 92-93.  Defendant does not deny that some communication took place regarding the delay in Facchina's payments to Carles, although Defendant claims that the contact initially was made by Facchina.[12]  According to Defendant's claims counsel, John C. Dugan:

> Dugan:   When Facchina contacted us in 2006, it was a completely different circumstance than what we are here for today. The circumstance was money was not flowing properly and there were issues with getting people paid.  We talked to both sides and the situation resolved it. [sic] Carles started getting money,

---

McGaughan as the general contractor."  Travelers Reply (re: Travelers' Motion to Disqualify Plaintiffs' counsel), ECF No. 30, p. 2. It is undisputed that payment bonds were issued naming Facchina as principal, and that such bonds originally were issued by St. Paul.  At some point, Travelers apparently merged with St. Paul or acquired St. Paul, such that the companies appeared to be the same corporate entity by the time that Carles and Facchina were in litigation against each other in 2007.

[12]Plaintiff states that he made contact with Defendant's claim counsel, Chris Dugan, and with the gentleman at Travelers whom had issued the bond for Carles, but no representative from Travelers visited the job site.  Id.  "I called Chris Dugan in '06 – in October or November of '06 to come down and see the disaster that Facchina had at their job site because I knew there was problems coming."  Carles Test., p. 93.

people started getting paid, project moved forward, nothing happened for several years after that."

...

| | |
|---|---|
| Question: | What was the substance of the original contact [by Facchina]? |
| Dugan: | Again, there were problems with money flowing from one side to the other, whether it was fronting to Carles or Carles down to subs, and Facchina wasn't paying properly or paying on time. They contacted us. We contacted both sides. They worked it out amongst themselves so we didn't have to get involved, and then it worked itself out. |

Testimony of John C. Dugan, Jan. 19, 2012, ECF No. 111-4 ("Dugan Test."), p. 17.[13]

On August 3, 2007, Facchina "partially terminated" Carles on the basis of a claimed default in its performance as to the Quantum on the Bay project. Letter from Derek V. Murphy, Facchina's Project Executive, to Rey Carles, dated August 3, 2007, ECF No. 128-2.[14] "Per your Subcontract, you have failed to perform the work. Specifically, you have failed to provide *sufficient* properly skilled workers, failed to perform the work *per the agreed upon schedule* and by your *lack of productivity*, you have *delayed* the performance of other subcontractors." Id. (emphasis added). The letter clearly reveals that the claimed "default" was related to the claimed delay by Carles in performing the work.

Facchina stopped paying Carles as to *both* construction projects;

---

[13]The page number refers to the transcript, not the filed document.

[14]The "termination" clearly was only a termination as to some aspects of the contract, as Facchina specified that Carles was "expected continue [sic] it's Work to complete all of their contract and remedial work." ECF No. 128-2.

Plaintiffs believe that Facchina took that action as to both projects solely because remedial work on the Quantum on the Bay project wasn't getting done fast enough. Carles Test., p. 81.[15] After completing its work on the Brickell construction project in 2007, Carles filed two lawsuits against Facchina and St. Paul (one lawsuit as to each construction project) seeking unpaid contract amounts and damages.[16]

In the first suit filed by Carles, the Brickell project suit, Facchina filed a counterclaim against Carles for alleged construction defects and delays, claiming damages[17] in excess of Carles's demand for payment, Tolling Agr., ECF No. 29-1, but Facchina did not include a claim against Travelers (issuer of the performance bond naming Carles as principal).

As to the Quantum construction project suit, no counterclaim was filed in the state court until after the parties agreed to arbitrate that dispute, when Facchina apparently then brought a counterclaim against Carles. Facchina did not, however,

---

[15]There is no evidence before the Court that the parties' contract as to the Brickell project permitted Facchina to cease making required payments to Carles as to the Brickell project solely because of purported delays by Carles as to the Quantum project.

[16]Case No. 07-24733-CA-20 (filed August 7, 2007, as to the Brickell on the River project), and Case No. 07-31269-CA-24 (filed September 25, 2007, as to the Quantum on the Bay project).

[17]The record is somewhat unclear, but it appears that all of these damages claimed by Facchina related to the Quantum on the Bay project.

initiate a claim against Travelers in the arbitration; indeed, "Travelers was never brought in as a party until Travelers moved to intervene." Affidavit of Kerry H. Lewis (prior counsel for Plaintiffs), December 17, 2010, ECF No. 29-2 ("Lewis Affid."), ¶ 9.

In light of the agreement to arbitrate the dispute as to the Quantum project, the parties entered into a tolling agreement in April 2008 as to both lawsuits. Tolling Agr., ECF No. 29-1. At the time that the Tolling Agreement was negotiated, Carles was still represented by its long-time counsel Kerry Lewis.[18] According to Mr. Dugan, Travelers had tendered its defense to Ms. Lewis and her law firm, Elder & Lewis, P.A., after Carles sued Facchina; this agreed joint representation continued until more than one year after the execution of the Tolling Agreement. Affidavit of John C. Dugan, dated November 8, 2010, ECF No. 26-1 ("Dugan 2010 Affid."), p. 3, ¶¶ 5, 12. During this time period Travelers discussed with Ms. Lewis, as counsel for Carles, a "strategy for *prosecuting* Carles' claims" against Facchina as well as "defending [against Facchina's] counterclaims." Id., ¶ 8 (emphasis added). Indeed, these discussions formed the basis of Travelers's successful motion to

---

[18]Prior to her disqualification from representing Plaintiffs in this case Ms. Lewis's law firm had served as counsel for Carles Construction for more than fifteen years. Lewis Affid., ¶ 5.

disqualify Ms. Lewis from representing Carles in this action.[19]

The effect of the Tolling Agreement was to abate any claims against St. Paul (named as a Defendant by Carles) and Travelers.  Tolling Agr., pp. 3, 10. According to Plaintiffs' counsel at the time, the parties understood that Travelers held the bonds as to both Carles and Facchina: "In an effort to mitigate costs, in light of the fact that Travelers has issued bonds on behalf of both Carles Construction and Facchina-McGaughan," counsel for Carles and counsel for Facchina "negotiated a tolling agreement whereby claims against the sureties, would be abated until conclusion of the litigation between the contractors."  Lewis Affid., ¶ 11.[20]

At some point in 2008, Carles was unable to pay its subcontractor, Shore Form Systems, reportedly because Facchina had not yet paid Carles for work performed; consequently, Shore Form Systems sued Travelers to collect on the payment bond Travelers had issued naming Carles as principal (guaranteeing that Carles would pay its subcontractors). Carles Test., p. 86;

---

[19]See Travelers Motion to Disqualify Plaintiffs'/Third Party Defendants' Counsel, ECF No. 26, and this Court's Order Granting Motion to Disqualify Counsel, August 19, 2011, ECF No. 42.

[20]Consistent with the Tolling Agreement, on June 2, 2008, Carles filed a Notice of Voluntary Dismissal in each of the state court actions, dismissing without prejudice "St. Paul Fire and Marine Insurance Company and St. Paul Travelers Companies, Inc."  See Case No. 07-24733-CA-20, and Case No. 07-31269-CA-24 (Miami-Dade County Records, Bk 26423 Pg 3690, Pg 3700).

Affidavit of John C. Dugan dated July 17, 2013, ECF No. 128-1 ("Dugan 2013 Affid."), ¶¶ 11, 19.a.  The Shore Form Systems matter "is the only matter that actually named Travelers as a defendant."  Defendant's Reply re: Motion to Disqualify Counsel, ECF No. 30, p. 7.

In the summer of 2009, Travelers hired the law firm of Mills Paskert Divers, P.A., thereby replacing Carles's prior counsel, Ms. Lewis, "because it was clear to Travelers that Carles' counsel was not sufficiently defending Travelers' interests in the Underlying Litigation and Shore/Form Litigation." Dugan 2013 Affid., ¶ 15.[21]

> Well, prior to us bringing our own counsel on, prior counsel had, I would say, upwards of two years to *prosecute* and/or defend the two claims.  And we learned, I want to say about six months prior to the arbitration, that at that time she had done no discovery.  She conducted no depositions.  Her only witness in the case was her client, that was the only witness she had.  She had no experts.  She produced no documentation, nothing.  At that point we brought in our own counsel to get discovery moving, bring in an expert and put forth a defense and/or a *prosecution* of claims.

Dugan Test., p. 37 (emphasis added).  According to Travelers, Facchina had "filed counterclaims against Carles ... seeking damages from Carles in excess of 400% of the damages asserted by Carles ... and ultimately sought to recover its damages

---

[21]At that time, counsel for Carles reportedly "had not conducted any written discovery, obtained any documentation, retained any expert witnesses, etc." Id., ¶ 16.  As noted by then-counsel for Carles, Travelers promptly sought to intervene in the Quantum on the Bay arbitration; "[d]espite the fact that the actions against the sureties had been tolled, in July 2009 the Mills Paskert & Divers firm sought to intervene in the Quantum on the Bay arbitration." Lewis Affid., ¶ 13.

14

directly from Travelers under the performance bonds." Dugan 2013 Affid., ¶ 10.[22]

Shortly after Travelers hired its own counsel, the Shore Form Systems matter was settled by Travelers for a payment of $214,000 by Travelers. Travelers' Facts, ¶ 9.[23]

During the arbitration proceedings as to the Quantum construction project, Facchina reportedly submitted a Revised Specification of Claims on January 30, 2009, setting forth the damages it alleged were caused by Carles.[24] In support of its claim, Facchina offered an expert report prepared by Capital Construction Consultants, Inc. ("CCCI Report"). Travelers reviewed a copy of the CCCI Report. Dugan Test., p. 50. In response to Facchina's claims against Carles, Travelers hired an expert, Lovett Silverman Construction Consultants, to conduct an analysis of the CCCI Report and an independent analysis of the construction record of the Quantum on the Bay project. Lovett Silverman produced a report dated August 31, 2009, ECF No. 122-2 ("L.S. Report") which detailed a number of errors in the CCCI Report.[25]

---

[22]Despite the fact that Travelers perceived of this potential liability, there is no evidence in the record before the Court that Travelers requested Carles to post collateral or that Travelers made any other financial demands on Carles during the pendency of any of these actions in state court.

[23]See also, Stipulation of Dismissal With Prejudice, *Shore/Form Systems v. Travelers*, Case No. 08-76548-CA, Miami-Dade County Records, Bk 27029, Pg 3638.

[24]Lovett Silverman Report, ECF No. 122-2, p. 52.

[25]To be clear, the experts for Facchina and for Travelers analyzed only those damages claimed by Facchina as to the Quantum on the Bay project. The record before the Court does not reveal that Facchina ever made a claim (against Carles or Travelers) as to damages solely related to the Brickell on the River project.

As evidence of the flaws in the analysis contained in the CCCI Report, Travelers's experts noted that the total costs reported by CCCI to be the responsibility of Carles were $14,514,798, although a table summarizing the exact same items of costs revealed a total of only $12,754,330 in costs.  L.S. Report, pp.53-54.  A review of the summary of the total costs reported by CCCI reveals that nearly $8,000,000 were delay-related costs, id., p. 53, but that such costs were not supported by contemporaneously-produced documentation.  Nor was there sufficient documentation of the approximately $3,350,000 in claimed remediation damages.

> Based upon the time tickets provided, determination of responsibility of any party is not possible with a reasonable degree of certainty.  Specifically, there is an absence of contemporaneous or subsequent documentation or analysis identifying any party as a cause for the remedial work....  Additionally, numerous tickets for which Carles is being charged, on their face, have corrective work items for which others appear to be responsible.

L.S. Report, p. 59.  "[T]he possibility exists that a number of different trades could be responsible for aspects of the work for which [Facchina] is attempting to collect damages from Carles."  Id., p. 61.  "[N]o documentation was identified indicating [Facchina] investigated the cause of this alleged deficient work or provided an opportunity for Carles to inspect, assess, or rebut the cause of the allegedly non-conforming work."  Id.

According to Lovett Silverman's analysis, there were 250 calendar days of delay as to the Quantum on the Bay project; however, Carles only should have been held responsible for, at most, "a net total of 15 days of delay" (i.e., 6% of the total delay).  Lovett Silverman Rep., p. 51.  In addition, "there were 16 days of delay

associated with slower-than-expected progress of the installation of the elevator entrances ... that was not attributable to either party.  Carles may be partially responsible for these 16 days of delay."  Id.  Thus, the expert concluded that "in the absence of an extension of time under its subcontract, Carles would be liable ... for a maximum of 31 days of delay."  Id.  Thus, at most, Carles was responsible only for 12.4% of the total delay, or only $992,000 of the approximately $8,000,000 claimed as delay damages.

As to the approximately $3,350,000 attributed to remediation costs, id., p. 53, Travelers's expert found that Facchina's expert report was flawed in several respects.  "The remediation cost total utilized by CCCI is identical to the amount stated by [Facchina] in its Revised Specification of Claim.  In reviewing CCCI's report it appears, and/or is stated that CCCI (1) determined its opinion as to the costs attributable to Carles based upon cost records provided by [Facchina]; and (2) adopted the identical position as [Facchina] related to the remediation costs attributable to Carles."  L.S. Report, p. 55.[26]  "Additionally, numerous tickets for

_____

[26]The experts who prepared the Lovett Silverman Report, included thirty pages of analysis of Facchina's delay-related claims and more than twenty pages of analysis of the claims related to remediation issues.  Unlike Facchina's hired expert, which apparently determined its opinion by simply adopting the position of Facchina as to the remediation costs attributable to Carles, without conducting independent analysis, Lovett Silverman reviewed the "Project record" independently.  "To properly determine that Carles was the cause of the alleged remediation costs incurred by [Facchina], it is necessary to review the available Project record and, through independent review, confirm that Carles' actions, or lack therof, directly resulted in each of the alleged costs incurred."  L.S. Report, p. 55.  Travelers's expert concludes that "CCCI could not have arrived at its conclusions regarding causation" if it actually was relying on the documents it

17

which Carles is being charged, on their face, have corrective work items for which others appear to be responsible." Id., p. 60. A review of the report prepared by the experts hired by Travelers reveals that the flaws in the claim made by Facchina ranged from gross error (e.g., charging Carles for remedial work for carpet),[27] to typographical mistakes (e.g., charging Carles for an hourly rate of $4,145 instead of $41.45).[28]

Armed with their respective experts' reports, Carles and Facchina proceeded to mediation on two occasions in 2009, Dugan Test., 111-4, p. 66,[29] along with their counsel and accompanied by Travelers and its attorneys. The parties do not agree as to what was discussed at mediation, and Defendant objects to introduction of any of the mediation-related communications as evidence. (This Court disagrees with Defendant's analysis of the issue, as addressed below.)

According to former counsel for Plaintiffs, "[a]t each mediation conference Travelers insisted that the Travelers's representatives and the Mills Paskert & Divers's attorneys be given a separate room from Carles Construction's

---

claimed to have analyzed. Id., p. 55.

[27]"The list of time tickets provided by [Facchina] includes approximately $52,000 in Capform tickets identified as remedial/slab remedial work for carpet." P. 60.

[28]"In one instance, [Facchina] has charged Carles at an hourly rate of $4,145 instead of the apparent correct rate of $41.45. Assuming Carles could be responsible for this charge, this is an over billing of approximately $28,745 for this one ticket." P. 60.

[29]The citation refers to pages of the deposition transcript, not of the filed document.

18

representatives and the Elder & Lewis's attorneys despite the fact that Travelers and Carles Construction's interests should have been aligned." Lewis Affid., ¶ 15. The inference is clear: Plaintiffs believe that Travelers was excluding Plaintiffs from discussions between Travelers and Facchina as to the claim made by Carles against Facchina.[30]  Travelers's employees attending the mediation (the claim team on the claim filed against Carles as to the Brickell project: Chris Dugan, Mr. McDonnell - managing director to whom Mr. Dugan reported, and Mark Marino) knew prior to the mediation that Facchina had a surety account with Travelers. Transcript of Deposition Testimony of Mark S. Marino,[31] June 13, 2013, ECF No. 111-5 ("Marino Test."), pp. 15, 24, 33 (of the transcript).  According to Mr. Carles, who was present for mediation but apparently was not a part of all of the negotiations, "I believe that [Travelers] went towards Paul Facchina's side because of the amount of money he's paying out in premiums per year to Travelers." Id., p.

---

[30]Mr. Marino has testified that he had no involvement in the claim that Carles made against Facchina on the Brickell project (which presumably had triggered a claim against the bond issued by St. Paul naming Facchina as principal).  Marino Test., p. 47.  Mr. Marino testified that the claim was handled by someone in his company's (i.e., *Travelers's*) Baltimore office. Id. (Notably, no one from the Baltimore office of Travelers was invited to the mediation, id., although the payment ultimately made by Travelers to Facchina of $3.55 million "encompassed both [the Quantum and the Brickell] projects." Id., pp. 47-48.)

[31]Mark Marino, a Second Vice-President of Travelers, was responsible for management of claims handled within his surety claim group's area: the southeast portion of the United States.  Marino Test., pp. 6-7.

60.[32]

According to Travelers, it ultimately reached an agreement with Facchina to settle all claims of Carles and Facchina for a single payment of $3,550,000 to Facchina, and nothing to Carles.  Dugan Test., pp. 106, 112; Marino Test., pp. 31-32; Letter from Mills Paskert Divers to Carles, dated October 7, 2009, ECF No. 122-1 ("MPD Letter").  On October 7, 2009, Defendant advised Plaintiffs, as Indemnitors, that if they wished to direct Travelers to "repudiate the proposed settlement and continue the litigation and arbitration of the above claims, please deposit with Travelers the total sum of $5,000,000 within seven (7) days from the date of this letter."  MPD Letter.  Travelers advised that if the sum was deposited "to pay past expenses, expert costs, attorneys' fees and the anticipated future expense for those items" then Travelers would "abrogate said settlement" and continue with the litigation and arbitration.  Id.

Plaintiffs did not deposit the funds demanded by Travelers and instead filed this lawsuit.  Plaintiffs' claimed damages are the balance of the contracts, and

---

[32]Travelers's representative Dugan has denied knowing whether Facchina currently maintains an account with Travelers.

| | |
|---|---|
| Question: | Have you written any bonds where Paul Facchina or Facchina-related entity, I mean, you, Travelers, is the principal? ... Since 2008 |
| Dugan: | I have no idea |
| Question: | Who would know that information besides Mr. Facchina? |
| Dugan: | I guess an underwriter for the Facchina account. |
| Question: | Do you know if there is still an account? |
| Dugan: | I don't. |

Dugan Test., pp. 57-58.

"retainage and delay damages owed by the Defendant's principal [Facchina] or that were owed by the Defendant's principal [Facchina]." Plaintiff's Rule 26 Disclosures, ECF No. 18, ¶ 3. In response, Travelers filed a counter-claim and third-party claim seeking indemnification pursuant to the General Agreement of Indemnity. Defendant claims to have made payments totaling $4,246,869.35, which includes the $3,550,000 payment to Facchina and the $214,000 payment to Shore/Form Systems, in addition to attorneys' fees, consultant costs, etc. Dugan 2013 Affid., ¶ 19.

## ANALYSIS

As an initial matter, the Court must address a question raised by the Defendant as to the evidence offered by Plaintiffs.

### Defendant's Motion to Strike

Plaintiff Reinaldo Carles has offered his own affidavit in support of Plaintiffs' claim that summary judgment is inappropriate. Affidavit of Reinaldo M. Carles, Jr., filed August 2, 2013, ECF No. 122 ("Carles Affid."). Defendants seek to strike the affidavit and argue that it contains confidential mediation communications which are prohibited from publication by Fla. Stat. § 44.405.[33] Motions to strike are

---

[33]Defendant also references Local Rule 16.2(g), which provides that all proceedings of "*the* mediation shall be confidential and are privileged in all respects as provided under federal law and Florida Statutes § 44.405." S.D. Fla. L.

properly directed at pleadings, Fed. R. Civ. P. 12(f), and are not the proper method for challenging an affidavit.  The Court will, however, address Defendant's argument as it highlights the conflict at the essence of the parties' dispute.

Florida law provides that all mediation communications[34] shall be confidential, and participants shall not disclose a mediation communication to a person "other than another mediation participant or a participant's counsel."  Fla. Stat. § 44.405(1).[35]  The purpose of the ban on disclosure of mediation communications is to preclude admission of settlement offers between parties who are opposing parties at the trial in which the evidence of the settlement is sought to be introduced.[36]  In the present case, the communications at issue pertain solely to

---

R. 16.2.G.2 (emphasis added).  This Local Rule clearly references mediation conferences as to cases pending before this Court, and "the" mediation conference referred to is the mediation of a civil dispute between parties to a proceeding in this District, presided over by a mediator certified in this District and subject to other procedural requirements.  S.D. Fla. L. R. 16.2.  The mediation communications which Defendant seeks to exclude relate to the mediation of a state court dispute, involving at least one party, Facchina, not presently before this Court.

[34]A "mediation communication" is an oral or written statement, or nonverbal conduct intended to make an assertion, by or to a mediation participant made during the course of a mediation, or prior to mediation if made in furtherance of a mediation. Fla. Stat. § 44.403(1).

[35]There are several exceptions to this prohibition, e.g., if a communication is "[o]ffered for the limited purpose of establishing or refuting legally recognized grounds for voiding or reforming a settlement agreement reached during a mediation." Fla. Stat. § 44.405(4)(a)(5).

[36]"Mediation could not take place if litigants had to worry about admissions against interest being offered into evidence at trial, if a settlement was not reached." DR Lakes v. Brandsmart USA of West Palm Beach, 819 So. 2d 971, 974 (Fla. Dist Ct. App. 4th 2002).

settlement discussions between Facchina (a non-party to this action) and Travelers (recall that Travelers presumably was aligned with Carles at the time).[37]

Plaintiffs seek to introduce as evidence a portion of the communications which took place during the mediation.  Specifically, Plaintiffs urge this Court to consider the following statements by Mr. Carles:

> [A]t the mediation, I was placed in a room with my attorneys, Elder & Lewis, PA, along with John Dugan, Dennis McDonald and Mark Marino from Travelers, Kevin Mekler, Esquire and Seth Mills, Esquire of the Mills Paskert Divers Law Firm, attorney's for Travelers and their expert, Don Carlow from Lovett Silverman.
>
> Prior to and at the mediation, Mr. Mills, as the agent for Travelers, told me that in no way would [Facchina] be receiving any payment as a result of their claim. According to Mr. Mills, all of the evidence supported my claims against [Facchina and] did not support [Facchina's] claims against Carles which would have to be paid by Travelers, if proven.  Mr. Mills advised me that I would be getting paid for Carles Construction, Inc.'s claims.
>
> After that discussion [of the claims and the lack of evidence to support Facchina's claims against Carles], I was separated with my lawyers from Travelers representatives, their lawyers and expert.  Shortly thereafter I was informed at the mediation by Travelers, contrary to their own position and contrary to the evidence in their possession that I would not be receiving any compensation for my claims against [Facchina].  In fact, I was advised that Travelers was forgiving [Carles's claims] in addition to paying Facchina-McGaughan $3,550,000.00 which resulted in no money to Carles Construction, Inc.

---

[37]The interests of Carles and Travelers were "expressly aligned by the Bond and the Tolling Agreement."  Travelers Reply brief (re: Motion to Disqualify) ECF No. 30, pp. 3-4.  "Travelers was ultimately obligated to pay any losses to Facchina-McGaughan under the terms of the Bonds [issued to Carles]" and "Travelers and Carles' interests and obligations were aligned in the underlying [state court] lawsuits."  Id., p. 8.

Carles Affid., ¶¶ 6-9.[38]  Plaintiffs argue that they offered the Affidavit in response to

statements made by Defendant's attorneys in the letter dated October 7, 2009.

Specifically, the letter states that as a result of the mediation,

> Travelers and Carles have the opportunity to settle all outstanding claims
> pertaining to these projects for payment to Facchina in the amount of
> $3,550,000.  The prospective settlement envisions a release of Facchina's and
> Carles' claims against one another and Facchina's release of claims against
> Travelers in relation to the Quantum and Brickell Bonds.  As we discussed
> with you and your counsel at the recent mediation, the prospective
> settlement includes a release of Carles' affirmative claims on both the
> Quantum and Brickell projects.... [S]hould a settlement not be reached, ...
> Travelers and Carles face potential liability well in excess of $3,550,000 in
> arbitration.

MPD Letter.

In addition to enumerated statutory exceptions to Florida law prohibiting

disclosure of certain types of confidential communications, other exceptions have

been identified.[39]  For example, when a party makes a claim in reliance on a matter

which ordinarily would be privileged the party may be deemed to have implicitly

waived the right to assert such privilege.  In <u>Savino v. Luciano</u>, 92 So.2d 817 (Fla.

---

[38]In addition, Mr. Carles has testified that "on the day of the last mediation,
the mediator walked into the door and said, remember that this gentleman had $2
million worth of insurance policies with you guys at the moment per year."  Carles
Test., p. 57.  "Like I said, the mediator walked in the room and said, remember – let
me remind you that Paul Facchina, not Facchina-McGaughan has over $2,000,000
in policies a year with Travelers."  Carles Test., p. 98.

[39]For example, at least one court has found that it is acceptable to disclose a
confidential settlement demand when determining whether the "amount in
controversy" requirement has been met as to a question of federal jurisdiction.
<u>Floyd v. Wal Mart Stores East, LP</u>, 2012 U.S. Dist. LEXIS 108962 (N.D. Fla. Aug.
3, 2012).

1957), the Supreme Court of Florida articulated what is known as the "at-issue" doctrine. That court vacated a lower court's ruling that the accountant-client privilege extended to an audit and report prepared for a defendant employer when faced with a suit by a former bookkeeper claiming to be owed profits pursuant to an employment contract.  Noting that the defendant had waived such privilege by relying on such items in his affirmative defense and counterclaim which were to be proven at trial, the Supreme Court of Florida held that the accountant-client privilege did not prohibit the disclosure of the subject audit and report. Id. at 819.[40]

The inescapable inference from the Plaintiffs' pleading is that Defendant's conflict of interest caused Defendant to breach its agreements with Plaintiffs, as evidenced by the settlement of the claims brought by Carles against Facchina for no

---

[40]Applying this doctrine, i.e., that a party cannot hide behind the shield of privilege to prevent an opponent from effectively challenging pertinent evidence, the Eleventh Circuit has found that waiver of the attorney-client privilege under Florida law may occur when a party affirmatively injects a privileged communication directly into the litigation, as necessary to prove an element of a claim or defense.  In GAB Bus. Servs. Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987), the Eleventh Circuit determined that the issue of reasonableness of a settlement and the potential liability of a defendant as to the settled claim was at the "very heart" of an indemnity action brought by a claims adjuster against the insurer for whom it was the agent, seeking reimbursement for a settlement the adjuster had paid to the owner of an insured racehorse which died under suspicious circumstances.  The adjuster had paid a small sum to settle the underlying claim, and the insurer - which also had been sued by the racehorse's owner - had paid the full policy limits; in the action brought by the adjuster against the insurer, the insurer filed a counterclaim also seeking indemnification for what it paid to settle the underlying claim.  The Court of Appeals noted that the insurer - in order to prevail on its indemnity counterclaim - was required to introduce evidence as to the strength of the claim against which it had defended and, by injecting into the indemnity action the issue of the reasonableness of its attorneys' conduct in settling the claim, the insurer had waived the attorney-client privilege.

payment to Carles and the settlement of the counterclaim raised by Facchina for an arguably excessive payment by Travelers. Defendants deny any wrongdoing and, in seeking summary judgment, have raised an issue which necessarily requires an evaluation of how the settlement was conducted by Travelers and the result reached. For example, Travelers' Affirmative Defenses include the following:

> Plaintiffs' claims are barred because of Plaintiffs' failure to mitigate damages. Specifically, Plaintiffs "failed to actively pursue its [sic] alleged affirmative claims against Facchina." Affirm. Def. 5, 6, 7.

Moreover, Travelers seeks summary judgment as to its counterclaims and third-party claims - all of which directly raise the issue of the settlement payments made to Facchina allegedly pursuant to authority granted by Plaintiffs to Travelers in the Indemnity Agreement and bonds.

In conclusion, the Court does not find that Defendant has presented a sufficient basis for eliminating from consideration the evidence contained in Carles's Affidavit from consideration. Defendant's objections simply are inconsistent with the purposes of the prohibition on disclosure of mediation communications. None of the statements being disclosed reveal confidential communications as to *opposing* parties at the mediation.[41] Moreover, Travelers has raised defenses to Plaintiffs' claims of breach of agreement and civil conspiracy

---

[41]Either Travelers and Carles were on the same side (which suggests that it was solely the defense of the claim brought by Facchina against Carles that should have occurred during the mediation), and therefore the mediation statements are not as to opposing parties, or Travelers and Carles were on opposing sides (which would reveal that Travelers was acting on behalf of Facchina and not Carles during the mediation).

which require an examination of Travelers's conduct in settling the underlying disputes.  Having done so, Travelers cannot now seek to preclude the finder of fact from examining such conduct.[42]

### Defendant's Motion for Summary Judgment as to Plaintiffs' Complaint

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Maddox v. Stephens, 727 F. 3d 1109, 1118 (11th Cir. 2013).  The moving party bears the initial burden of proof, but having met that burden, the burden then shifts to the party opposing the motion to go beyond the pleadings and designate specific facts showing that there is a genuine issue to be tried.  The evidence and all factual inferences that flow from the evidence must be viewed in the light most favorable to the party opposing summary judgment. Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855 (11th Cir. 1988).

### Breach of contract

Defendant argues that the Plaintiffs lack standing to challenge the

---

[42]In an abundance of caution, however, the Court directs the parties to submit any additional evidence relating to mediation communications under seal in order to protect against the unnecessary public disclosure of mediation communications involving other individuals.

Defendant's decision to settle the claims of the obligee, Facchina.  However, Plaintiffs have not limited their allegations to a breach of contract relating to the bonds naming Facchina as obligee, and instead have alleged that Travelers suffered a conflict of interest because of payment bonds issued by St. Paul, a company apparently affiliated with or, indeed, the same as Travelers (the evidence is murky), and that such conflict harmed Carles as an obligee on *those* payment bonds.

While the submissions in this case from both parties might have been more clear and helpful, it is nevertheless sufficiently stated in Plaintiffs' pleading that: "Travelers breached its surety agreement with Carles Construction and acted in bad faith by settling Carles Construction's claims against [Facchina], notwithstanding the validity of those claims, and Travelers' own acknowledgement that Carles Construction's claims were valid and exceeded any claims that Facchina may have against Carles Construction." ECF No. 108, ¶ 21. The reference to a surety agreement does not limit this Court to consideration of the parties' Indemnity Agreement, nor does it limit this Court to consideration of only the bonds issued naming Carles as principal.  Indeed, Plaintiffs specifically complain of Travelers's settlement of the claims brought by Carles against Facchina, i.e., the claims implicating the bond issued originally by St. Paul naming Facchina as principal.[43]

---

[43]If the payment bond which named Facchina as principal contained similar terms to the payment bond Travelers issued naming Carles as principal, that bond provides that "The Principal and the Surety, for value received, agree that this Bond shall inure to the benefit of all persons having just claims as aforesaid,

28

To prevail on a breach of contract claim, a plaintiff must establish that there was a valid contract, a material breach, and damages. Merin Hunter Codman, Inc. v. Wackenhut Corrs. Corp., 941 So. 2d 396, 398 (Fla. 4th DCA 2006). Plaintiffs argue that Defendant breached its surety agreement with Carles Construction and also that Defendant acted in bad faith by settling Carles Construction's claims, and that Plaintiffs suffered damages.[44] Under Florida law, while a principal cannot sue its surety for statutory bad faith, an obligee may pursue a surety who fails to conduct the settlement of the obligee's claim in good faith.[45]

---

whether or not they have any direct contractual relationship with the Principal, as well as to the benefit of the Obligee, and that such persons may maintain independent actions upon this Bond in their own names." ECF No. 111-3, p. 1.

[44]During his deposition, Plaintiff Reinaldo Carles testified that the claimed breach of the surety agreement refers to a breach of the performance bond naming Facchina as obligee. This statement by Mr. Carles, a non-attorney, does not preclude the review of other evidence in this record relating to an alleged breach of the surety agreement.

[45]The Supreme Court of Florida has determined that an obligee (or owner) of a bond is considered an "insured" for purposes of the Florida Insurance Code. In answering a question certified by the Court of Appeals for the Eleventh Circuit, the Florida high court determined that an obligee on a surety contract is considered an "insured" with the right to sue the surety under Florida's statutory bad faith provision, Fla. Stat. § 624.155(1)(b)(1). "[B]ecause a surety is undertaking the responsibility of indemnifying the obligee of a surety bond, an obligee is an 'insured' as that term is ordinarily understood in the traditional insurance context." Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 945 So.2d 1216, 1226, (Fla. 2006). Concluding that a statutory bad faith action is available to an obligee seeking damages from a surety, the court quoted an observation by Judge Hurley in Shannon R. Ginn Constr. Co. v. Reliance Ins. Co., 51 S. Supp. 2d 1347 (S.D. Fla. 1999), that "'if any party has a claim for bad faith failure to settle [under Florida's statutory bad faith provision] it would be the ... obligee under the performance bond' since it is the surety who owes a duty of good faith to the obligee." Id., at 1227, quoting Ginn, at 1352.

The Court of Appeals for the Eleventh Circuit has observed that Florida's "statutory [bad faith] provision is grounded in the common law obligation of good faith that was traditionally imposed on insurers, which obligated insurers to 'refrain from acting solely on the basis of their own interests' rather than those of the insured party."  Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 483 F.3d 1265, 1276 (11th Cir. 2007) (reversing entry of summary judgment for surety).[46]

While Plaintiffs have not explicitly brought a statutory bad faith claim, the Plaintiffs' breach of contract claim specifically alleges that Travelers acted in bad faith.  To determine whether an implied covenant of good faith has been breached, a plaintiff must demonstrate that a party to a contract acted contrary to the reasonable expectations of the parties in performing the contract.  Under the unique facts of this case, the Court is compelled to examine whether Defendant's conduct violated a reasonable expectation of the Plaintiffs.

The salient element of this case - and the element which renders it unique among all the cited authorities and those precedents uncovered during this Court's own review - is that Travelers served as the surety for both parties to a single construction contract.  This dual role may have been inadvertent, as there is a mention by Travelers' representative as to Travelers having assumed ownership of

---

[46]The federal appellate court observed that Florida courts "repeatedly have held that the question of failure to act in good faith with due regard for the interests of the insured is for the jury."  Dadeland Depot, 483 F.3d at 1278 n.10.

St. Paul, presumably at some time after having issued the payment bonds in

2004/2005 naming Facchina as principal as to the two construction projects.

| | |
|---|---|
| Question: | Now, Travelers was the surety for Carles. Were they also the surety for Facchina? |
| Dugan: | Maybe. The reason I say that is because we – we have different arms of Travelers, so technically Travelers didn't write the · |
| Question: | Well, at some point they assumed the bond, correct? |
| Dugan: | Again, I don't know if it is still under the heading of Travelers or – |
| Question: | Or is it St. Paul? |
| Dugan: | It might be St. Paul, yeah. |
| Question: | Do you have any specific knowledge of when Travelers took over St. Paul? |
| Dugan: | No, I don't. |
| Question: | Who would know that information? |
| Dugan: | I have no idea. |

Dugan Test., pp. 28-29. The Court has combed through the record and identified

enough evidence to establish that, at a minimum, a question of fact exists as to

whether Travelers controlled the settlement of Carles's claims against Facchina

implicating the bond issued (by St. Paul, originally) naming Facchina as principal,

such that there is a question of material fact as to whether Travelers's conduct in

the underlying proceedings was without conflict.[47]

The record clearly reveals that Travelers and St. Paul are related at least in

some way. According to the "Tolling and Standstill Agreement" which was entered

---

[47]This is unlike the situation in Mercon, where a surety simply was using collateral, pursuant to its contractual right to do so, to settle a separate claim of a principal. Guarantee Co. of North America v. Mercon Construction Co., 2012 U.S. Dist. LEXIS 51351 (M.D. Fla. April 12, 2012) (dismissing principal's counterclaim against surety alleging breach of indemnity agreement as to performance bond where surety settled separate claim against obligee).

into between Carles, Facchina, St. Paul, and Travelers in the state court actions, notice to St. Paul was to be provided to Kelly D. Engel, at "Construction Services Claim, *Travelers Bond & Financial Products*" in Hunt Valley, MD, and notice to Travelers was to be provided to Chris Dugan, "Associate Claim Counsel, *Travelers Bond & Financial Products*" in Philadelphia, PA. <u>See</u> ECF No. 29-1, pp. 5, 12 (emphasis added). Defendant argues that St. Paul and Travelers "are two distinct corporate entities, with separate Federal Identification Numbers and registrations with the Florida Secretary of State." Defendant's Reply to the Motion to Disqualify Counsel, ECF No. 30. However, these corporate filings reveal that four of the six listed corporate officers of St. Paul (Wendy C. Skjerven, Brian MacLean, Maria Olivo, and William Heyman) are also officers of Travelers. ECF No. 30-1, pp. 1 - 4.

Defendant's corporate filings also are supplemented by the testimony of Defendant's own representatives.

| | |
|---|---|
| Question: | [As to the] claims involving Carles against Facchina. Was there a claims person or just you? ... |
| Dugan: | I didn't handle those claims. |
| Question: | Who handled them? |
| Dugan: | Somebody in *our* Baltimore office.... I think her name was Kelly Engle. |
| Question: | When did you first learn of the claims [by Carles against Facchina]? |
| Dugan: | I'm not sure to be honest with you. Again, I didn't handle those claims, it wasn't assigned to me. |
| Question: | When was the - when were they assigned to you? When was this matter assigned to you? |
| Dugan: | This matter was not assigned to me. Again, when you say "this matter," you are talking about the claims by Carles against Facchina? |
| Question: | Correct. |
| Dugan: | That was not assigned to me. |

Dugan Test., pp. 11-12 (emphasis added).[48]

|  |  |
|---|---|
| Question: | Were there any documents between yourself and Paul Facchina? |
|  | ... |
| Dugan: | Well, the claim between Carles and Facchina would have been some other office, some other claim file, Kelly Engle's file.  To the extent that we have anything of that would sort of be in our file, I guess. |

Dugan Test., pp. 60-61.

Thus, the evidence strongly suggests that a single corporate entity was the surety on both sides.  Regardless of whether this dual role was inadvertently created, it is nevertheless clear that Travelers did nothing to avoid the conflict even after it became obvious.  For example, when this conflict initially was uncovered in 2006 - through contact by "both sides" of the dispute,[49] Travelers might have prepared to hire separate counsel to represent Carles's interests against the Facchina payment bond.  Travelers did not do so.  When the litigation was filed by Carles in state court in late 2007, Travelers might have hired separate counsel;

---

[48]See also, the testimony of Defendant's claim counsel:

|  |  |
|---|---|
| Question: | "Did Travelers or their agents or attorneys ever assure Carles that their claim was valid and Facchina's claim was invalid?" |
| Dugan: | "No." |
| Question: | "How do you know that?" |
| Dugan: | "Unless it happened from the Baltimore office [of Travelers]." |
| Question: | "Who would that be?" |
| Dugan: | "The person handling Carles' claim [against Facchina]." |
| Question: | "That's Kelly?" |
| Dugan: | "Engle." |

Dugan Test., pp. 51-52.

[49]Mr. Dugan stated that when he was contacted in 2006 regarding payment problems, Travelers "contacted both sides.  They worked it out amongst themselves so we didn't have to get involved, and then it worked itself out." Dugan Test., p. 17.

Travelers did not do so. Plaintiffs, in essence, were forced to pursue litigation against their own surety company in order to obtain payments due from Facchina.[50] As stated by Plaintiffs: "Travelers ... orchestrated a settlement wherein claims of Carles Construction have been jettisoned in favor of Facchina, also its principal on the payment bonds." Plaintiffs' Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, ECF No. 121 (Plaintiffs' Facts), ¶ 17.

Although Travelers's witness denies having ever spoken with Ms. Engle (who signed the Tolling Agreement on behalf of St. Paul and who reportedly works out of Defendant's office in Baltimore), it is evident that the settlement negotiated by Travelers combined the claims of both Carles and Facchina as to both of the construction projects.

> Question:  [Y]ou combined the two projects to negotiate, right?
> Dugan:     Yes.
>            ....
> Question:  At some point you treated it as one negotiation.  My question is:
>            Who made that decision.
> Dugan:     We did, Global Travelers.

Dugan Test., pp. 54-55.  Thus, while Defendant does not admit that it operated under a conflict of interest, Defendant does not deny that it made the decision to settle the affirmative claims which had been brought by Carles against Facchina, even though those had been brought against a separate bond.

> Question:  Did you ever have an opinion as to Carles' claim, backing out
>            Facchina's claim, acting in a vacuum, did you ever review

---

[50]Plaintiffs "commenced litigation against [Facchina] and its payment bond with Travelers as the surety/insurance company."  Carles Affid., ¶ 3.

|            | Carles' claim for its merit? |
|------------|---|
| Dugan:     | No, not per se. |
| Question:  | Why not? |
| Dugan:     | 'Cause the claim was against the different bond. |

... What we looked at was what proofs where there and we had Rei [Carles]. Again, they didn't have that discovery done.... Kerry Lewis did very little to prosecute that claim.

Dugan Test., pp. 61-63.

According to Plaintiffs, Travelers violated "the duty of good faith and fair dealing inherent in every contract," Plaintiffs' Facts, ¶ 11. As support for this assertion, Plaintiffs refer generally to the Affidavit of Reinaldo Carles.

> The intent of the settlement agreement between Travelers and Facchina-McGaughan, LLC reached at mediation was to put Carles Construction, Inc. out of business and continue the beneficial relationship that Facchina and Travelers had at the time, and still have today. By entering into the Mediation Agreement and closing two (2) liabilities of Facchina-McGuaghan [sic] LLC, Travelers continued their larger beneficial relationship with Paul Facchina, a principal of Facchina McGaughan, LLC who still maintains a surety account with Travelers to this day.

Carles Affid., ¶¶ 13-14. In addition, Plaintiffs critique the CCCI Report, a copy of which had been provided to Travelers to support Facchina's claims against Carles, noting that "[p]art of the claim to Carles Construction was a claim by Kone, the elevator company, which they themselves have letters saying that they didn't have enough manpower to do the job and they threw that into a claim against Carles Construction." Carles Test., p. 88. "Even out of Seth's [Seth Mills, attorney for Travelers] mouth, after time went by and I showed him the schedules, the pictures, the fax, the letters, everything, even from his mouth he said that we didn't owe

Facchina-McGaughan a dollar.  That they owed us the money." Id., p. 95.[51]  "The fact is, the facts were there plain and clear as day and Travelers [still] decided to pay Paul Facchina three and a half million dollars." Id., p. 108.

Plaintiffs complain that Travelers failed to pursue Carles's valid claims for unpaid contract earnings due from Facchina.[52]

| | |
|---|---|
| Question: | Do you have a separate report for an evaluation of Rei's claim? |
| Dugan: | I don't, no. |
| | ... |
| Question: | So in handling the claim and making the ultimate decision, you had your expert report, you didn't do a report on Rei's claim, correct? |
| Dugan: | We didn't have one. |
| | ... |
| Question: | Look, when you're faced with a $16 million claim, even assuming that everything Rei says is true, if you take the $4.5 million off of the $16 million, we are still left with a loss of $7.5 million [sic]. |
| | ... |
| | [W]e came to a determination was that [sic] Facchina's claim was worth more than · significantly more than what Rei's claim was worth. |

Id., pp. 64-65.

---

[51]According to Plaintiffs, when the expert hired by Travelers examined the record, they found no support for Facchina's conclusion that $16 million was due. "[B]ecause when they went through Facchina's documentation, which were X amount of boxes, none of them had ['back-charge Carles, this is Carles's fault']." Carles Test., p. 107.  "The reason for that is because each and every ticket that was supposed to be attributed to Carles Construction had no markings on it, none whatsoever.  Facchina-McGaughan took a pile of claims that they wanted to put together and put it on their report.  All of which was a false claim against Carles Construction." Id., p. 106.

[52]Facchina apparently did not dispute that it had failed to pay Carles for those amounts but instead claimed that the delay damages owed to Facchina by Carles offset anything Facchina owed to Carles.

| | |
|---|---|
| Dugan: | Again, the bottom line is that Facchina's claim was well above and beyond what Rei's claims were. |
| | .... |
| Question: | So aside from the reports and the analysis, anything else that came into your claims decision? |
| Dugan: | That was it. It's the totality of the circumstance. It is everything that goes into the circumstances. It's the report. It's the experts on either side. It's the attorney on either side. It's the potential cost for getting to a win. It is a type of cost for getting to a loss. |
| Question: | What was the potential cost for getting to a win? |
| Dugan: | Several hundred thousand dollars, if not in the millions. We would have had to hire additional experts in order to – I mean, **winning on Rei's claim too**, so we would have had to prop up his claim on top of properly defending the $16 million claim. |

Id., pp. 80, 82-83 (emphasis added).[53]

Although Defendant denies having shown favoritism to Mr. Facchina,[54]

Defendant's position is contradicted by the testimony of Mr. Carles. "The

representative that Travelers had there, which was Chris Dugan said that we did

not owe a dollar to Facchina-McGaughan. That they owed us our money." Carles

Test., p. 79. "There's absolutely no way for me to know what happened between

Facchina-McGaughan and Travelers. What I do know is, on the day of the last

mediation, the mediator walked into the door and said, remember that this

---

[53]This testimony suggests, again, that Travelers had assumed the prosecution of Carles's claims against Facchina.

[54]Question:   In handling this claim, did Travelers show any favoritism toward Facchina based on its prior business relationship, meaning Paul Facchina or Facchina entity, prior business relationship with Travelers?
Dugan:   Certainly not.
Dugan Test., p. 95.

gentleman had $2 million worth of insurance policies with you guys at the moment per year." Id., p. 57. "I believe that [Travelers ultimately] went towards Paul Facchina's side because of the amount of money he's paying out in premiums per year to Travelers." Id., p. 60.

As noted above, only approximately one-half of the $16 million claim by Facchina was related to delay damages. If Carles was only responsible for at most 12.4% of the delay costs, then of the $8,000,000 in delay-related damages, Carles's responsibility would have been at most $992,000. As to the claimed $3,350,000 in remediation damages, Travelers's own expert expressed doubt that any proof of causation had been offered which could establish that Carles was responsible. Defendant claims that it "believed at the time it settled the claims against the Bonds and performed its bonded obligations that FMG and Shore/Form would have continued to pursue Travelers to recover under the Bonds, incurred a considerable amount of attorneys' fees, costs, expenses, and pre-judgment interest, and the aggregate amounts of their claims would have continued to rise. Thus, by settling the claims Travelers mitigated both its losses, and its Indemnitors' losses." Dugan 2013 Affid., ¶ 22. However, "conclusory allegations without specific supporting facts have no probative value." Leigh v. Warner Bros., 212 F.3d 1210, 1217 (11th Cir. 2000) (citations omitted).

In the final analysis, Travelers eliminated Carles's claim for lack of payments owed by Facchina totaling approximately $4,500,000 (as to which it appears that Travelers conducted no research to determine the validity of those claims,

apparently accepting them as valid), and then paid an additional $3,550,000 to

Facchina, for a grand total benefit to Facchina of $8,050,000.  In essence, Travelers

settled a grossly inflated claim of $16,000,000 by ultimately allowing Facchina to

recover more than 50% of the claim.[55]   If Travelers had not been operating under an

apparent conflict of interest, perhaps it would have been more aggressive in

pursuing Carles's claim against Facchina (and St. Paul, pursuant to the payment

bond issued to Facchina to which Carles was an obligee) for the failure to make

contractual payments.  Instead, Carles was left with a loss of the $4,500,000 in

unpaid earnings, and now also faces a claim from Travelers for indemnification in

excess of $4,000,000.[56]

------

[55]Recall that Facchina's own expert report didn't substantiate the full amount
claimed by Facchina, and Travelers expert determined that the portion of delay
damages which arguably might have been Carles's responsibility was less than
$1,000,000.

[56]The Court observes that no demand for collateralization was made by
Travelers until October 2009, a fact which may be of interest to the trier of fact.
See, e.g., Auto-Owners Insur. Co. v. Southeast Floating Docks, Inc., 571 F.3d 1143
(11th Cir. 2009) (in statutory bad faith action, court observed that during first three
years of investigation of claim, surety had concluded there was no reasonable risk of
liability and did not seek collateral from principal, and jury could have concluded
that subsequent demands for collateral were intended to undermine principal's
attempt to litigate the claim).
    It could be argued that Travelers benefitted from Carles's confidential
information as to its financial instability, and therefore was able to resolve the
claim against the St.Paul-issued bond rapidly, knowing that Carles could not afford
to pursue protracted litigation.  And it could be argued that if Travelers had not
stepped in and hired Lovett Silverman to prepare a report as to the inflated damage
claim presented by Facchina, Travelers and Carles might have been found
responsible for a substantially larger sum than $3,550,000 in an arbitration award
to Facchina.  Such arguments are of the type properly made to the trier of fact and
are not before the Court at this time.

<u>Civil Conspiracy</u>

Plaintiffs accuse Travelers and Facchina of conspiring "to fraudulently conceal Carles Construction's claims." ECF No. 108, ¶ 23. Florida courts recognize an independent claim of civil conspiracy, i.e., without the need for an underlying tort, only when it is established that the conspirators had the power of coercion through numbers or their economic influence. <u>Churruca v. Miami Jai-Alai, Inc.</u>, 353 So.2d 547, 550 (Fla. 1977) (jai-alai players adequately stated conspiracy claim against those arena owners who allegedly conspired to prevent the players from being employed in the arenas). Plaintiffs argue that Travelers and Facchina had the power of coercion. According to Mr. Carles: "[B]oth companies had the same bonding company." Carles Test., p. 53. "We didn't have a choice. As soon as Facchina filed its claim, Travelers stepped in and hired [attorneys] to resolve the issue." <u>Id.</u>, pp. 46-47.

A plaintiff also may establish a claim for civil conspiracy by demonstrating that an agreement existed between two or more parties to do an unlawful act (or a lawful act by unlawful means), that some overt act was done in furtherance of the conspiracy, and that plaintiff was harmed as a result. <u>See</u>, <u>e.g.</u>, <u>Russo v. Fink</u>, 87 So.3d 815, 819 (Fla. Dist. Ct. App. 4th 2012). Plaintiffs claim that Travelers - with the evident agreement of Facchina and its counsel - settled the disputes which were pending between Carles and Facchina and that this was a tortious act which

40

harmed Plaintiffs.[57]  Specifically, Plaintiffs allege, and claim to have proven, that Travelers fraudulently misrepresented the merits of Facchina's claim against Carles, ignored Travelers's own expert report and "orchestrat[ed] a settlement to fraudulently eliminate Carles Construction's claims against Facchina, for which Travelers was liable, in favor of its own client, Facchina."  ECF No. 108, ¶ 24. The claims from Facchina were "all fabricated after the fact that I finished both of their jobs."  Carles Test., p. 47.  Facchina did not have sufficient documentation against Carles for their claims."  Id., p. 52.

"I believe that [Travelers] went towards Paul Facchina's side because of the amount of money he's paying out in premiums per year to Travelers."  Id., p. 60. Plaintiffs deny "that no evidence exists establishing a conspiracy between Travelers and Facchina-McGaughan to reach a settlement wherein Carles Construction's claims were dismissed and Facchina-McGaughan was paid on its affirmative claims."  Plaintiffs' Facts, ¶ 15.  Finally, Plaintiff Reinaldo Carles testified that Carles Construction was damaged by these events.  "Basically Carles Construction is out of business....  I lost my bonding capacity and everything else that goes along with it ... [as a result of] Facchina not paying us."  Carles Test., pp. 84-85.[58]

---

[57]The Court observes that if St. Paul and Travelers are to be viewed as independent entities in this action, then it appears that Travelers disposed of a claim it did not control when it settled Carles's claims against Facchina and St. Paul.  Guarantee Co. of North America USA v. Mercon Construction Co., 2012 U.S. Dist. LEXIS 51351 (M.D. Fla. April 12, 2012).

[58]Defendant also argues that Plaintiff's claim for "Declaratory Relief" pursuant to Fla. Stat. § 86, as pleaded in Count III, must fail as it seeks a judicial

In summary, a review of the record before the Court reveals that Plaintiffs have at least minimally established a basis to defeat the Defendant's motion for summary judgment; thus, Defendant's motion for summary judgment is DENIED.

<u>Motion for Summary Judgment as to the Counterclaims and Third-Party Claims</u>

Defendant, as Counter-plaintiff and Third-Party Plaintiff, seeks summary judgment as to the four counts of its Counterclaim and Third-Party Claim. Defendant argues that none of the affirmative defenses raised by Carles, its individual owners, and Carles Management are legally sufficient.[59]

Plaintiffs admit that they are indemnitors of Travelers and are obligated to pay to Travelers any amount Travelers "in good faith pays on behalf of Carles Construction." ECF No. 108, ¶ 28. Plaintiffs have alleged, however, in their Eighth Affirmative Defense, that Travelers "breached the contracts between the parties by acting in bad faith in settling Carles Construction's claim against [Facchina] for no remuneration without the consent of the Plaintiffs." ECF No. 109, p. 6. In support

---

declaration that Plaintiffs are not obligated to indemnify Defendant because Defendant "acted in bad faith and with an irreconcilable conflict of interest" and, therefore, Defendant is "in default of the bond agreements and of the indemnity agreement." Defendant argues that this claim is redundant of Plaintiffs' claim for breach of contract and Plaintiffs' defense to the Counterclaim for indemnity. The Court need not resolve this issue at this time; to the extent that the claim is redundant, the resolution at trial of Counts I and II of Plaintiffs' complaint, and the Counterclaims, will render this moot.

[59]Travelers is not arguing, nor would such argument be successful, that the provisions of the Indemnity Agreement signed by Carles also applied in some manner to the payment bond issued by St. Paul as to which Carles was the obligee.

of this allegation, Plaintiffs have offered evidence that the claims paid by Travelers were invalid and that Travelers payments were made in bad faith.[60]

Settling a principal's claim against a payment bond issued on behalf of the obligee on the principal's performance bond does not constitute a breach of the indemnity agreement if the surety had the authority to settle the claim and acted in a good faith belief that it was required to act.  Indeed, a surety "may settle claims regardless of whether liability for the claim actually existed." Liberty Mut. Ins. Co. v. Aventura Engineering & Constr. Co., 534 F. Supp. 2d 1290, 1306 (S.D. Fla. 2008).[61]  None of the reported cases, however, involve a situation in which the same surety stood on both sides of a dispute, as did Travelers in this case.

"Whether a surety has settled a claim in good faith or not, of course, depends on the particular facts of the case." Auto-Owners Insur. Co. v. Southeast Floating Docks, Inc., 571 F.3d 1143, 1155 (11th Cir. 2009) (reversing lower court's setting aside of jury verdict finding surety engaged in bad faith).  In that case, the appellate court observed that the jury could have found that the surety had unreasonably ignored the assessment of its own employees as to the merits of the

---

[60]For example, Mr. Carles testified that "during the course of three years on that job, [Facchina] did not give me one back-charge that they claimed at the end that I owed them.  This was all fabricated after the fact that I finished both of their jobs." Carles Test., p. 47.

[61]A surety has the right to compel payment by a principal and/or indemnitors after a specific demand has been tendered to the surety, and also has the right to compel such payment when the principal or indemnitors refuse to post collateral as security for a probable bond liability.  Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, 2009 U.S. Dist. LEXIS 112955 (Nov. 13, 2009).

claim on the bond, and also that the jury may have found that the surety's investigator was biased and his assessment of the claim unreasonable. Id. at 1154. "While evidence of an unreasonable and inadequate investigation and handling of a claim, standing alone, may be insufficient to support a finding of bad faith, the jury in this case also heard evidence to support an inference [the surety] had an improper and self-interested motive to settle the claim." Id.

Defendant not only seeks indemnification for the amount paid to Facchina, but also for the payment of $214,000 to Shore Form Systems. Plaintiffs respond to the Defendant's demand by arguing that such action was necessitated only as a result of the failure of Facchina (or St. Paul or Travelers) to pay contractual amounts due to Carles. As this issue is inextricably intertwined with the question of whether Defendant breached its agreements with Plaintiffs, and as the essential issue of breach of the agreements remains to be tried, the Court finds that summary judgment is not appropriate as to the counterclaims and third-party claims.

In summary, while Travelers has demonstrated that the Indemnity Agreement generally would require Plaintiffs to satisfy Travelers's demands, that Agreement must be considered in the context of the clear conflict under which Travelers operated at the time it took actions purportedly pursuant to that Agreement. Having reviewed the record, the Court does not find that Travelers has established an entitlement to summary judgment on this issue. Questions of fact remain as to, *inter alia*, whether the settlement by Travelers of Carles's claims against Facchina was conducted by Travelers without the burden of a conflicted

44

interest.

## Motions *in limine*

Defendant has filed several motions in limine.  According to the record, Plaintiffs have failed to respond in opposition to the motions.  The Court hereby grants the following of these motions:

- unopposed motion to prevent the calling of Defendant's counsel as a witness,
- motion barring reference to Defendant as an "insurer" or "insurance company" and
- motion barring the introduction of evidence on damages (unless such damages were addressed in Plaintiffs' initial disclosures).

As to Defendant's motion seeking to bar the introduction of evidence regarding mediation communications, the motion is DENIED, consistent with the Court's ruling on the Defendant's motion to strike Mr. Carles's Affidavit, discussed above.

## CONCLUSION

As described above, this case presents an unusual set of facts, involving a single surety, Travelers, which appears to have operated under a conflict of interest in resolving claims brought by two principals in litigation as to separately issued bonds.  The Court has determined that material questions of fact remain in dispute, and therefore summary judgment is not appropriate as to any of the claims.  In conclusion, for the reasons stated above, it is

ORDERED AND ADJUDGED that motions for summary judgment be DENIED as to all claims in the Second Amended Complaint, and as to the

45

Defendant's Counterclaim and Third-Party Claim.  Further, it is

ORDERED AND ADJUDGED that Defendant's motion to strike is DENIED; and Defendant's motions *in limine* are GRANTED with the exception of the motion seeking to bar mediation communications (ECF No. 131) which is DENIED.

DONE AND ORDERED in Chambers in Miami this 31st day of March 2014.

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT COURT JUDGE

Copies furnished:
    counsel of record